May it please the Court, Elizabeth Daly on behalf of the petitioner Mark Lane, and with the Court's permission I'll reserve two minutes for rebuttal. These three appeals all present the Court with the question of whether the Bureau of Prisons Regulation prohibiting threatening another can reasonably be interpreted to extend to statements that are not true threats. Procunior v. Martinez provides the correct First Amendment test for judging this regulation, but these cases can and should be resolved under administrative law principles because the regulation is unambiguous. Threat has a well-defined- What is there in the phrase threatening another that requires the threat to be a true threat? It comes from the plain meaning of the word threat in federal law. What federal law? Federal law as applied to criminal cases and in an administrative context. Well, I guess I'm trying to figure it out because I couldn't find it. I see threatening another under my interpretation of the plain meaning of that phrase, it would cover all threatening communications. The standard for what is a true threat is those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. Well, but just a minute, we're not in every situation, we're in the BOP situation. So what case am I going to look at in the prison context that requires the Bureau of Prisons to prohibit true threats? What case law, what regulation, what anything do I find that would suggest that they could only prohibit true threats? I couldn't find it. Let's stop the contention here. The Bureau of Prisons has authority to prohibit a broad range of conduct. In this case, threat naturally means only true threat. If it's not limited to that definition, then the question arises, what is a threat that is not a true threat? A non-serious expression? But it seems to me then at that point, if they can be more than true threats, that the Bureau of Prisons can implement regulations that infringe on the prisoner's rights as long as they do not violate pro cuneare. You said it better than I do because I'm from Idaho. Pro cuneare be Martinez. I think there's two questions that you're getting at. The first question is, what does this regulation mean? And it's a separate question whether this regulation violates the First Amendment. So whether the Bureau of Prisons can do it is separate from whether they did it in this instance. Well, I read the regulation and I'm still back with my first questions. I have a tough time seeing where threatening another gets to be a true threat. So then I moved, and I'm not trying to be obstreperous or even hide the ball here. Then I looked, well, where do I find this? And then I said, what case would say that it can only prohibit true threats? Didn't find any. And I said, well, then at that point, if they can implement regulations, where do I look to see if the regulations pass the test? And I looked pro cuneare, I say Martinez. I looked at Martinez and I said, well, do the parties even talk about it? And they didn't. Well, we did file supplemental briefing in response to the court's concern addressing the Martinez standard, and I think it sets out why a more expansive interpretation of threat is not only not playing from the face of the regulation, but that it would raise serious First Amendment concerns. If it's not a true threat, then it's not a serious expression. It's perhaps a joking expression. Where's the limit of that? It might not be a serious threat. It might not be an intentional threat. If I look at Martinez, we're not really talking about that. We're talking about, does it further an important governmental interest? And we talk about, secondly, the limitation of the First Amendment must be no greater than is necessary or essential. So I have to apply that test. I guess I'm having a tough time. Could this regulation be more narrowly tailored than in this particular interest? It can be more narrowly tailored by only prohibiting true threats as related to outgoing mail. And this is a regulation that prohibits all forms of speech, both within the prison, face to face, in statements directed to correctional staff, in statements directed to inmates, and in statements directed in private correspondence to family members. You agree with me, don't you, that restrictions on prisoners could be much more burdensome than the normal non-prison population? Yes, in some respects. And therefore, since it can be more burdensome, I'm having a tough time seeing how this regulation couldn't meet the Martinez test. I think the answer is in the expansiveness and the ill-defined boundaries. Looking at Bradley v. Hall, even though it applied the lesser Turner test of reasonableness is helpful, because in that situation, an expansive regulation that prohibited hostile, sexual, abusive, or threatening language was deemed to not meet the reasonableness test, in part because there were easily available more narrow regulations that could meet the legitimate interest. Here, we need a greater interest and an even more narrow fit. But you agree, don't you, that the tailoring of the regulation would not need to be the least restrictive? No. They've said generally necessary, which requires a close fit. So you'd agree with Rithrow on that. So even if a prisoner doesn't intend to act on a threat, doesn't the prison have an interest in preventing any threatening communication? No. There's a difference between not intending to act on a threat and not intending a threat. A statement that is joking or a boast is not an intentional threat. Well, if I read what the disciplinary hearing officer said, he said the action behavior on the part of any inmate to make any sort of threat toward any person poses a threat. In the past, evidence has clearly shown threats to be carried out or other inmates who have witnessed the threat being made. This type of action behavior cannot and will not be tolerated. And I say to myself again, the tailoring doesn't have to be the least restrictive. It seems to me, given the test I have in this context, which is in prison, rather than on the outside, that it meets the Martinez test. I don't think that's the right analysis. In Bradley v. Hall, they rejected similar rationales for the regulation. They said that any disrespectful comments targeted at staff could prevent the staff from exercising that self-restraint, which is required in the correctional environment. And this court said that such absolutist arguments did not satisfy the First Amendment requirements. And similarly, in Martinez, they said the context isn't solely within the prison. The First Amendment analysis has to consider the rights of the free correspondence of the prisoners, and they categorically said that statements going out of the prison do not raise the same institutional security concerns as statements made within the prison environment. I mean my last question about this, because I think you've tried to answer my questions. The last question I have, since your client didn't make this argument in the district court, should I remand to have a hearing about this? The issue- We have to take new evidence here. We have to determine whether the Martinez test applies. And I'm having a tough time seeing why it doesn't. And then at that point, then I have to see if the regulation meets the Martinez test. And your client was pro se, should I remand to make sure the district court thinks about this, on developing whether there's a substantial government interest, or can the regulation be more tailored? The court should reverse- I'm asking you, tell me, should I do that? The court should reverse because the Bureau of Prison's interpretation of this regulation was unreasonable.  I understand, but now take my question and answer it. Now if the court determined that this case had to be resolved on First Amendment grounds and could not be resolved based on an interpretation of the regulation, then a remand to apply the Martinez test would be appropriate. Thank you for answering my question, ma'am. You know, I just wonder why, if you read what he said on, I believe, three occasions, everything that he said is a threat to taking human life. It's obvious, it's clear to anyone who reads that. I don't know why you don't see that. And he's in a prison setting. It's not a summer camp. It's a place where discipline needs to be imposed. And you can't have people writing stuff like he writes or uttering what he says to the prison personnel. I don't think my judgment and commitment was verified. He's going to bet my life. Are you willing to bet a guard's life? Bet a guard's life. I don't like it when people play games with my life. He goes on. There are others here. The December 7, 2010, the Marshals Service notified the prison that Lane had authored a threatening letter addressed to the Senate Judiciary Committee, and Representative Mike Pence. Lane wrote, I may be forced to protect myself and take a life. I'm doing my best to avoid trouble. I will never let the federal government violate my rights and not take action. Lane was asked whose life he intended to take or who he would harm. He responded, I cannot predict the future. And he committed a number of acts, threatening another party with human life. In another one, he wrote a second letter addressed to the district court clerk in Evansville, Indiana, talking about when the deal goes down, I want to make sure they come for you. And Mr. Brad Blackington. Lane wrote in the postscript, steel does damage to the human body. I personally, or personal, knows I had put some work in at Greenville. The fucker bled like a stuck pig. Fuck. It wasn't like that. The government hasn't contended in any of these cases that these statements. Unless you would give them the merit badge. No. The government hasn't contended in any of these cases that these statements qualify as a true threat, and I think that's appropriate, because the statements don't identify any particular person or group of peoples as their target. They are all phrased, primarily phrased conditionally in the future. They don't have the hallmarks of clarity specifics that define a true threat. But I think my colleague's questions are appropriate given your argument, because your argument is that it is either a true threat or nothing. So if we assume, without deciding that you're right, that this is appropriate for only true threats, then at that point don't we only have to determine if there's some evidence that the statements were true threats? Isn't that the standard, some evidence? That's the standard. And if that is the standard, then what is some evidence? Because my colleague writes or, I mean, he speaks pretty forcefully about what your client said. And if I assume, as you have stated, that it only applies to true threats without deciding it, then what's my standard as to some evidence? Because it's a little tough for me to suggest there's not some evidence, especially as my good colleague has read what he said. The Bureau of Prisons did not reasonably. So what if the Bureau of Prisons did not argue it? Does that prevent me from determining it since you argued it has to be true threats? If I may, the question is whether the Bureau of Prisons reasonably interpreted the regulation as applying to statements that are not true threats. If this regulation applies to statements that are not true threats, then the question arises, what are the boundaries of that regulation? It would apply to a whole host of not just these statements, but to a whole host of statements that we don't know where the regulations would be. That's where Johnson comes into play. But that seems to put yourself in the same place where you didn't want to be when you answered my questions in the first place, which was if it isn't true threats, then it's threats. And if it's threats, then I have to determine if it meets the Martinez test. You can't make two arguments to me. Either I'm either going to take your argument that it's for sure true threats, and then there has to be some evidence, and if I find some evidence your client loses, or I've got to take the opposite approach. I've got to say, well, it applies to all threats, as the government would suggest, and as the government does not suggest, and I think mistakenly, doesn't take the Martinez test into account. An interpretation of the regulation to extend to non-true threats would violate the First Amendment as well as the Due Process Clause under the Johnson standard. Only if it violates Martinez. I don't think that's correct. Don't be the case that says it isn't. Martinez is the First Amendment standard. The Due Process Vagueness standard is a different standard. I see you want to look at the Due Process Vagueness, all right. And because the regulation wouldn't provide standards to govern when the Bureau of Prisons personnel could determine what was a threat, whether it was something that was not serious, or whether it was a joke, or whether it was a statement made without intent to threaten the Bureau of Prisons personnel would have no guidance to make those determinations. But if we look at vagueness, a statement only has to be threatened another with sufficient definite that ordinary people can understand it. It must be defined in a manner that does not encourage arbitrary and discriminatory enforcement. If I look at what Lane said and apply vagueness, it's a tough argument for you to suggest that it doesn't meet the Due Process standard. These statements were not specific. They were in the context of requesting remedial harm for what Mr. Lane perceived to be injustice in his commitment. None of them named a specific target. And in each letter he used a polite and respectful tone towards the recipients. It's also important that the recipients weren't any of the alleged targets of these threats. One letter was, in fact, a private correspondence with a person named Brian Dempsey. It wasn't directed to any guard in the institution. It wasn't directed to any other inmate. And the standard for determining what is a threat is provided by the true threat standard. Unhinged from that definition, what is a threat is difficult to discern. The Due Process argument comes into play because of the requirement that there have to be standards, but it doesn't change the fact that the regulation in this case only prohibits threatening another. If we don't know what threatening is, then the discipline imposed in this case would be invalid under the administrative principles and not under any constitutional principles. Thank you. May it please the Court. My name is Natalie White, and I represent the respondent, Federal Bureau of Prisons, in this case. The Court should focus on the decisions made by the district court in this case. Those two decisions that the district court made, one, that the BOP properly relied on some evidence to determine that this petitioner committed the prohibited act, and that the BOP also deserves deference in interpreting their own regulation. I believe the petitioner in this case is trying to force the true threat definition and also force this case to adhere to federal criminal standards. And we're talking about prison disciplinary proceedings, two very, very different processes with different goals and effects. So you're willing to suggest, though your argument in your brief is a little unclear, that this regulation only applies to true threats? I don't believe that's correct, Your Honor. Your Honor, you're saying this regulation does not apply only to true threats. This applies to BOP threats. Well, if it doesn't apply only to true threats, then how did the district court get around looking at Martinez and applying it? Why didn't you argue it? At the district court level, there was no direct challenge to the actual regulation itself. The only challenge at the district court level was whether or not there was some evidence, any evidence, to find petitioner committed to this prohibited act. But the problem comes in that if it isn't a true threat, which you have more, if you will, leeway to enforce and it's back to a threat, then I'm having a tough time seeing why somebody shouldn't have thought about Martinez and applied it. I mean, even if the prisoner was there as pro se and doesn't understand all of this, it seems to me the government would have said, my goodness, we're arguing a threat. This threat has some limitations to it. Isn't there a test for that? Maybe we ought to make some evidence about that and therefore decide what we needed to do. If we're going to go under his theory of true threat, well, some evidence would be good and it would be a fine idea to apply. But it seemed to me the government never did argue true threat. In fact, the government argued quite the opposite. That's correct. And perhaps at that point three years ago, it might have been a good idea at that time to address potentially a challenge to the regulation, but it was not presented. We address disciplinary challenges regularly and they're limited. The standard for reviewing these challenges to these prohibited acts is simply some evidence with strong deference to the findings by the disciplinary hearing officer. Would it have benefited us to have a record before us now showing our substantial interest in having this regulation? Definitely. Well, it seems to me that in defining threat, it would be difficult to know whether there's some evidence of threat, unless you knew whether it was true threat or threat. Well, Your Honor, the use of the word threat is plain meaning, common definition use of the word threat. And this is something that includes something of an intent, the communication that intends to threaten another. And this is something that while... You're really not suggesting, are you, that threat equals true threat? No, not at all, Your Honor. And that's what I thought. So at that point, if I'm looking at a true threat, I'm going to have a different some evidence approach than I am if it's a threat. Absolutely. And then I've got to know what is the some evidence that supports the DHO's decision to know what a threat is. And if we haven't defined threat, I'm still back at that point where it seems to me somebody from the government should have said we better look at the Martinez test. Again, if it had been presented to us at the district court level, a direct challenge, this is a habeas petition. Many of those Martinez cases are brought under First Amendment, 1983 type or Bivens type challenges. This is a 2241 habeas petition, very specific at the district court level in all three cases what the challenges were. But you would agree with me, wouldn't you, that our case law makes clear that if a prisoner is punished for statements made in outgoing mail, that it may implicate his First Amendment rights? Potentially it could implicate his First Amendment rights. So then why not put a Martinez test involved in the district court? If it's a First Amendment right that might be infringed and the government doesn't want to say true threat, they want to say general threat. Again, Your Honor, that is something to take with me in the future. It is not always our place to make the argument for pro se prisoners, although we do quite often, and perhaps, again, this is something that we should have done. I think it's important to talk about just the common definition of threat versus the true threat that they're trying to impose upon us, and the true threat now which incorporates more of a mens rea component, which the Bureau of Prisons' disciplinary prohibited acts have never incorporated that mens rea element. And even in the Ilanis case, which the holding doesn't apply to this case, because, again, that involves a true threat in the application in a criminal statute, the court actually does provide some instructive language about the common definition of threat, a common definition that we use in the Bureau of Prisons' language, a common definition that is applied in a sum evidence standard. And it does incorporate the communication with the intent to injure, and they give several definitions. They cite Oxford, they cite Webster's, they cite Black's communicated intent to commit harm. But the one thing the court states is that these common definitions of a threat speak to what that statement conveys, not to the author's mental state. And they specifically state that a victim who receives this letter in the mail with the threat, I will kill you, it's a threat, even if the author believes wrongly that the message will be taken as a joke. It is still a threat. Therefore, for a common definition of threat, that mental state is not required. And that's the definition the Bureau of Prisons uses for prohibited acts. Again. If I were to suggest that in my view, if you're going to go for threat, rather than true threat, you've got to undertake the Martinez test in order to make it happen. What should I do in this situation? If the court is compelled to address the First Amendment issue, it would be beneficial, I believe, to appropriately fill the record with information from the Bureau of Prisons besides the regulations, policy statements, and information that we've provided to you in the supplement. But perhaps it would help the court to also have declarations from corrections staff, some examples of recent. Potentially, if the court is going to decide the validity of a regulation based on the First Amendment, we would prefer that the record be developed on that issue. There, as you know, we briefed this quite recently. There is. Frankly, I saw that you briefed it, and you put Thornburg in front of me and Turner in front of me. And while other circuits may love those, I can't do anything about those, can I? Given that I have Martinez squarely on the record in front of me, and this is a three-judge panel, and even though I got Honorable Pregerson as the chief of the three-judge panel, I really can't go around what our law is, can I? Well, no, you can't go around what your law is. But there is an argument to suggest that Martinez directly, as it stood in 1974, does not apply to the current facts of this case, although this is not on the record and something that has not been briefed fully. There is a suggestion. And we have to send it back for that argument. Absolutely, that perhaps it's a Turner test that applies to this type of language in this case. All right. Well, it's a complicated subject. To me, I think the primary consideration is whether it's going to expect that the person or persons against whom the threat is directed would take it seriously and feel that they had to do something to protect themselves from this individual who is making these utterances that suggest that they're going to put someone else's life in danger and, again, we're in the prison context. Discipline is important. And you get all of that through Reed-Martinez. Even if the court chooses to apply the Martinez test, either on appeal or on remand, it's our position that we would also satisfy the Martinez test as well, if that is the test that is applied. Is there any reason why we couldn't apply Martinez now, based on the 30, 40 years of case law about the need to have discipline in prison, is what Judge Prager is discussing. What would a remand, I mean, I assume in the remand someone from the prison would say, you know, these guys are really bad and gangs are really dangerous, and last week someone got stabbed. I think there are plenty of cases that demonstrate prisons are pretty bad places. So what else would a remand accomplish? Well, Your Honor, if, again, you're applying the pure Martinez test, that basically requires a least restrictive means analysis, and there has not been any evidence provided on that particular issue. So that goes beyond just the legitimate penological interest that the prison has in maintaining the safety and order of the institution. It goes deeper, again, stricter, as to whether the Bureau of Prisons could have applied other regulations, less strict regulations, and that's just simply not in this record. Even still, I assume, and again, I don't want you to be making the argument for your opposing counsel here that she can do that when she gets back up. But I'm trying to understand what more the prison could do. I mean, the prisoner writes these things. I mean, would they have to assess, well, did he really mean it, and investigate every time a piece of paper comes across with a prisoner writing something? Is that what the further inquiry would be? You're asking what more evidence would be? Well, when you say there needs to be a least restrictive means, what would be? Again, this is more a question for her than for you, but I'm trying to understand what would be a less restrictive means than this. We would likely argue that there is not one, especially in trying to enforce this particular regulation, which is broadly interpreted to include all threats, that there is not a least restrictive means. And so that's something that we would have to prove with evidence, statements, the history of the application of this regulation, its enforcement, the use of resources, how it's actually investigated. There's all sorts of information that we could get into on the application of this regulation that I think would benefit us in the Martinez test. If the Court has no further questions. Thank you. Thank you. This is a regulation that applies to both speech within the prison, which raises a whole host of security concerns related to within-prison gangs, to maintaining discipline and order within the prison. But this regulation also applies to speech in outgoing correspondence, speech that might never be read by staff within the institution and speech that's intended to be an expressive outlet for a prisoner serving time. In that situation, a less restrictive regulation could punish non-true threats only within the institution, assuming that there were some standards for governing what is a non-true threat. Or as to outgoing mail, it could be limited to true threats, or for example, speech that encourages violence or speech that's intended to intimidate or harass its recipient. Those would be examples of easily promulgated regulations that are less restrictive and have less infringement on prisoner First Amendment rights. I just wanted to touch briefly on why the mental state element is included in this. The mental state in Virginia v. Black is a component of the true threat. And in Alanis, we know that it goes to culpability, that a statement uttered without intent to threaten is not as culpable as a statement made with intent. When you're looking at a non-true threat that perhaps is unreasonably interpreted or that is made without that intent, then the government's interests under the First Amendment test are lessened and the due process vagueness concerns are increased because there's less standards governing when discipline can be imposed. Well, how would you state the rule? Say you were on a committee that develops changes to the restatement of torts. How would you state the rule? For a regulation? In this case. You were going to draft the regulation. How would you draft it? I would draft a regulation prohibiting true threats in outgoing mail, and that regulation would not implicate any First Amendment rights because true threats are not protected. Because true threats are what? Are not protected speech under the First Amendment. So a regulation that prohibits only true threats in outgoing speech would not implicate. What about a threat that causes people in the institution to take that threat seriously, even though the prisoner is not pointing to a particular individual? Well, for example, a regulation targeted at speech within the institution could prohibit any speech that incites or encourages violence. Can you repeat that? A regulation that prohibits speech within the institution that incites or encourages violence. That would encourage violence? Yes. A regulation for within-prison speech could validly prohibit speech that encourages violence. All right. So what about in a situation like this where these threats are made and the word gets out in the prison that this individual, this prisoner, made the threats and they're not considered to be true threats, and then a number of the other prisoners start making those threats as well. And they talk to the guards. If you don't do what I want to do, I'm going to get my ship and I'm going to stick you like a stuck pig. As to outgoing correspondence, I don't think there's any risk of those statements coming back into the institution. That's not the risk that's identified in any of these cases, and that's not a risk that the Supreme Court has agreed with. There was a statement in Martinez that they rejected the justification that statements that magnify grievances or unduly complain could incite flash riots within the institution, and they said that as to outgoing mail, that concern was not justified. You're saying that that type of communication is limited circulation, or it's not circulated within the institution? Right, for outgoing correspondence. For what? For statements made in outgoing correspondence under the Martinez standard, that those statements, the Supreme Court rejected justifications that those statements could lead to violence within the institution. Well, you have all different sorts of gangs in prisons. They have ways to communicate. You know, you have guards that sell phones and help you get almost anything you want at Christmas today, so it's pretty hard to look at it as radically sealed. Well, if I might, and I see that I'm out of time, but in Barrett, this court did say that there may be room under the Martinez test to approve prohibitions on statements that are directed at gang involvement, so that would be another more narrow restriction that doesn't implicate the broad First Amendment rights here. In this situation, virtually any outgoing speech could be prohibited without limitations on that definition. All right, thank you. Thank you. This matter is submitted.
judges: Pregerson, Smith, Owens